Filed 9/14/22  P. v. Venable CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br>  v.<br>TRAVON RASHAD VENABLE, SR.,<br>    Defendant and Appellant. | E071681<br><br>(Super.Ct.No. FSB17002517)<br><br>The County of San Bernardino<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br>[No Change in Judgment] |

_____

THE COURT:

The petition for rehearing is denied. The Opinion filed in this matter on August 22, 2022, is modified to add the following.

In Section X, page 41, at the end of the second paragraph ending in "was harmless" we add the sentence, "We reject Venable's argument that failing to bifurcate was structural error because, as we discuss next, it's possible to determine whether it is reasonably probable Venable would have obtained a more favorable result if his trial had been bifurcated under section 1109."

In Section X, page 42, before the last paragraph of that section, beginning with "It's true the prosecution," we add this additional paragraph, "For the same reasons, we conclude failing to bifurcate trial as called for under new state law did not render his trial fundamentally unfair in violation of Venable's federal due process rights.[8] (See *People v. Gonzales* (2013) 56 Cal.4th 353, 385 ["The governing United States Supreme Court decisions establish that " 'a "mere error of state law" is not a denial of due process'"].)" Footnote 8 states, "Venable argues failing to bifurcate is not harmless when taken in combination with the other errors he identified. However, we have rejected these other

1

claims of error, so we need not consider their cumulative effect. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1030.)"

Except for the modification, which doesn't affect the judgment, the opinion is unchanged.

NOT TO PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

MENETREZ
J.

cc:    See attached list

MAILING LIST FOR CASE: E071681
The People v. Travon Venable, Sr.


Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730


Warren J. Williams
Office of the State Attorney General
P. O. Box 85266
San Diego, CA 92186-5266


Joshua Lee Siegel
Attorney at Law
171 Pier Avenue #314
Santa Monica, CA 90405


Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA 92101 2396

Filed 8/22/22  P. v. Venable CA4/2 (unmodified opinion)
Opinion following transfer from Supreme Court
*See Concurrence/Dissent*
### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071681 |
| v. | (Super.Ct.No. FSB17002517) |
| TRAVON RASHAD VENABLE, SR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Ronald M. Christianson, Steve Malone, and Michael A. Smith, Judges.[1] Affirmed in part, reversed in part, and remanded with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[1] Judge Christianson and Judge Malone both granted continuances of the trial, which defendant contends violated his right to a speedy trial. (See part II, *post*.) Judge Smith presided over the trial and made all of the other challenged rulings. (See parts III-IX, *post*.)

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Senior Assistant Attorneys General, and Steve Oetting, Christopher Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Bullets fired from a small white car killed one victim and wounded another. Both victims were members or associates of the Westside Projects (Projects) gang. Months later, when the police arrested a known informant for an unrelated offense, he offered to give them information about the shooting. He told the police — and he eventually testified — that defendant Travon Rashad Venable, Sr. was the driver of the car and one Elgin Johnson was the shooter. Both defendant and Johnson were members of the California Gardens Crips (California Gardens) gang, a rival of the Projects.

In a jury trial, defendant was found guilty of first degree murder (Penal Code, § 187)[2] and attempted murder (§§ 187, 664, subd. (a)).[3] On each count, a gang enhancement (§ 186.22, subd. (b)) and a gang-related firearm enhancement (§ 12022.53, subds. (d), (e)) were found true. In a bifurcated proceeding, after defendant waived a jury trial, one prior serious felony conviction enhancement (§ 667, subd. (a)) and one "strike"

---

[2] All further statutory citations are to the Penal Code unless otherwise indicated.

[3] Defendant was also charged with unlawful possession of a firearm. (§ 29800, subd. (a)(1).) However, the trial court granted a motion for acquittal (§ 1118.1) on this count.

prior (§§ 667, subds. (b)-(i), 1170.12) were also found true. Defendant was sentenced to a total of 129 years to life.

In this appeal, defendant contends:

(1) The trial court violated defendant's speedy trial rights by repeatedly continuing the trial to accommodate counsel for his then-codefendant Johnson.

(2) The trial court erred by admitting a rap video in which defendant appeared.

(3) The trial court erred by giving CALCRIM No. 315, which required the jury to consider a witness's level of certainty when evaluating an identification by that witness.

(4) The jury found defendant guilty of simple attempted murder, not willful, deliberate, and premeditated attempted murder. The People concede this point.

(5) The trial court erred by sentencing defendant on both the firearm enhancements and the gang enhancements. The People concede this point.

(6) Defendant is entitled to a remand so the trial court can consider striking the prior serious felony conviction enhancement pursuant to newly enacted legislation. The People concede this point.

(7) Pursuant to newly enacted legislation, defendant is entitled to a retrial so the gang allegations can be tried separately.

(8) The gang enhancements and the gang-related firearm enhancements must be reversed because the jury was not instructed in accordance with newly enacted legislation. The People concede this point.

(9) Defendant is entitled to a remand so the trial court can consider reducing the firearm enhancements pursuant to newly enacted legislation. The People concede this point.

We find no error other than those conceded by the People. We will remand to give the People the opportunity to retry the gang enhancements and the gang-related firearm enhancements and for resentencing.

I

FACTUAL BACKGROUND

A.     *Victim Drake's Account*

The surviving victim, Kiyon "Kiki" Drake, testified at trial. Drake admitted that he "sometimes h[u]ng out with" members of the Projects.

On March 5, 2014, around 12:15 p.m., Drake and his friend Enon "Bubba" Edwards were at the intersection of Medical Center Drive and Union Street in San Bernardino.

As they were crossing the street, someone in a small, older white car going north on Medical Center started shooting at them. They "took off running."

A bullet hit Drake in the back and came out through his chest. After he rounded a building, he looked back and saw Edwards lying on the ground. At a hospital, Drake was found to have a collapsed lung. Edwards died from a single gunshot wound to the back of the head.

4

Drake told police that the car slowed down as it approached. The passenger was leaning out the rear driver's side window. Both the driver and the passenger had handguns and started shooting. They were both Black males in their mid-20s. He testified, however, that he did not see the shooter.

B.   *Bystander Burley's Account*

Bystander Burley heard the shots. He saw a small, older white car, possibly a Honda, going by. A young black male was "hanging out of" the rear driver's side window, aiming a .22 rifle. Burley did not get a good look at his face and could not see the driver at all.

C.   *The Investigation*

At the scene, the police found a total of nine .22-caliber shell casings. They had all been fired from the same gun. The number of rounds indicated that the gun was a semiautomatic.

The police also obtained surveillance videos from some of the nearby businesses. These showed a small white car going south on Medical Center, then going north on Medical Center a few minutes later. As it passed the victims, it slowed down. A male was leaning out the rear driver's side window. A "shadowy thing," which could have been the barrel of a rifle, was sticking out the driver's side rear window.

D.   *Doe's First Statement to the Police*

Nearly three months after the shooting, on May 25, 2014, two officers – Officer Sims and Officer Plummer – conducted a traffic stop of a person referred to at trial as

5

John Doe. Officer Plummer had previously used Doe as a paid informant. Officer Sims searched Doe's car and found nothing. Officer Plummer, however, pointed out that Officer Sims had not looked under the rear seat cushion; there, they found a gun.

Doe then indicated that he had information about the shooting. The officers therefore took Doe to the station, where he was interviewed by the lead investigator, Detective William Flesher. Officer Plummer monitored the interview.

Doe said he was at the intersection and saw the shooting. An older white Kia Sephia that was going south on Medical Center turned around and waited in a parking lot. As the victims were crossing the street, the car drove north, slowly. It stopped in the middle of the street and "just started shooting." Doe heard the shots, looked, and saw more shots fired. He saw Drake run "around the thing," then fall. Edwards turned around but was hit in the head.

Doe identified defendant as the driver and Johnson as the shooter. Johnson was on his knees in the back seat, pointing a .22-caliber rifle "with a long clip" out the window. Defendant and Johnson were both members of California Gardens; Drake was a member and Edwards was an associate of the Projects.

After the shooting, Doe communicated with Johnson on Facebook; Johnson bragged, "Yeah. I shot him. So what." Johnson soon deactivated his Facebook account. Later, Doe asked Johnson why he did it; Johnson replied that he was "putting in work" for California Gardens.

Detective Flesher showed Doe individual photos of defendant and Johnson, and he identified them.

The police obtained Johnson's Facebook records but found nothing bragging about the shooting. However, it may be possible to delete Facebook messages. A photo of Johnson from his Facebook page showed him with a magazine that could be used in a rifle.

The surveillance videos, however, did not show Doe at the intersection where he claimed to have been.

E.     *Doe's Second Statement to the Police*

On June 3, 2015, Detective Flesher re-interviewed Doe. Doe said his first statement had been truthful, except about "the proximity." Actually, he was a block north of the intersection when he heard the shots. Afterwards, though, the car "drove right by [him]." He had "[n]o doubt" that he saw defendant and Johnson.

Doe also said that, while he did see a long gun, only later did someone else tell him it was a .22.

After the shooting, Doe asked defendant — not Johnson — why they did it. Neither of them told him they were putting in work for California Gardens; he inferred that.

This time, Detective Flesher showed Doe "six-pack" photo lineups; once again, Doe identified defendant and Johnson.

7

F.  *Doe's Statement to a Defense Investigator*

In April 2018, a defense investigator interviewed Doe. Doe told the investigator he did not see the shooting. He claimed the police were forcing him to identify defendant and Johnson; Officer Plummer planted a gun in his car, said it had been used in a murder, and used that as leverage to get him to give a false statement.

According to Doe, Officer Plummer said, "I need you to place yourself at the scene." Officer Plummer also told him that he was going to be shown "six-pack" photo lineups with tiny x's under the photos that he was supposed to identify.

Doe also told the investigator, however, that "he doesn't want a huge target on his back, his main concern was for his life and safety[.]"

Detective Flesher testified there were no x's on the photo lineups.

G.  *Doe's Testimony at the Conditional Examination*

On April 16, 2018, Doe testified at a conditional examination. When asked about his interviews with the police, he said an officer "told [him] to say it or else [he] was going to get charge[d] with murder." He added that defendant and Johnson were being framed.

H.  *Doe's Testimony at Trial*

At trial, Doe testified he was in protective custody and afraid for his safety.

He was acquainted with the victims. He was aware of defendant, whom he knew as "Trocc," and Johnson, whom he knew as "Mongoo."

8

On the day of the shooting, Doe was about a block west of the intersection when he saw a white Kia Sephia going south on Medical Center.

Some 20 to 25 minutes later, he was about a block north and slightly west of the intersection. He heard eight or nine "pops" and saw people running. Then the same white car "flew by [him]."

Defendant was the driver. Johnson was the passenger, sitting in the rear seat on the driver's side. Johnson was just pulling a rifle "back inside in the window." The rifle was a .22, with a clip.

In earlier interviews, when he said he was at the intersection, he saw Drake run, and he saw Edwards fall, he "might have been[] kind of[] confused . . . ."

Johnson did not tell Doe directly that he did the shooting to "put in work" for California Gardens. Rather, Doe saw a female receive Facebook messages from Johnson saying that "they" did the shooting.

Doe repeated his allegation that, after Officer Sims stopped and searched his car, Officer Plummer planted a gun in it; Officer Plummer then said he was going to charge Doe with a murder that had been committed with the gun, unless he provided certain information. Doe pleaded guilty to unlawful possession of the gun and was sentenced to two years in prison.

Later, Doe was charged with felony evading. He entered into a plea bargain that required him to testify truthfully in this case in exchange for a "favorable disposition" in that case.

9

His statement to the defense investigator was a lie.

I.    *Gang Evidence*

It was stipulated that California Gardens and the Projects are both "criminal street gangs." This included a stipulation that the primary activities of California Gardens included murder, attempted murder, possession of controlled substances for sale, assaults with firearms, unlawful possession of firearms, carjackings, robberies and burglaries. It also included a stipulation that members of California Gardens had been convicted of five predicate offenses. Finally, it was stipulated that defendant and Johnson were members of California Gardens.

Officer Sims testified as gang expert for the prosecution. He explained that California Gardens and the Projects are rivals. The shooting occurred in Projects territory. Victims Drake and Edwards were both members or associates of the Projects.

Defendant's moniker is "Trocc" and Johnson's moniker is "Mongoo."

In the expert's opinion, Johnson committed the shooting to get back in good standing with California Gardens. He had been in "bad standing"; in fact, a high-ranking member of the gang had shot him. After the charged shooting, however, Johnson was back in good standing.

The gang expert opined, in hypothetical form, that the shooting was committed at the direction of, for the benefit of, and in association with the gang.

J.      *The Rap Video*

On YouTube, the police found a rap video featuring defendant's younger brother, "Young Trocc." Defendant and other California Gardens members were also in the video. They could be seen flashing gang signs; they displayed guns, drugs, and money. At one point, defendant held a rifle with an extended magazine.

One of the lines in the rap was: "Got word from a bird[] that they did that nigga dead wrong/Slid up Medical and left that nigga head gone." According to the gang expert, this meant defendant's brother had heard that a California Gardens member shot someone else in the head on Medical Center. Until the charged shooting, no one had been shot in the head on Medical Center since 2007.

In the expert's opinion, the video was a way of "claiming ownership" of the shooting and bragging about it. He conceded it was the gang as a whole taking credit, and not any particular member of the gang.

K.      *Defense Evidence.*

Defendant lived with his aunt. She testified that, on the day of the shooting, he was at home all day. She remembered because, that same day, he was arrested for an unrelated probation violation. She had told police, however, that she did not remember what defendant did that day, but she did not think he was there the whole day.

Defendant testified on his own behalf. At first — despite his stipulation — he denied being a member of California Gardens. However, after being confronted with his own prior admissions, to the police and others, he admitted he was a member.

11

He denied being present at the shooting. He had never met Johnson until they were both arrested.

He participated in the rap video to support his brother. In it, he was just "portraying an image." The guns in the video were props, not real guns.

After the shooting, the police asked defendant if he had ever been in a white Kia. He said he had not. However, when they pointed out that in 2009, he had been stopped while in a white Kia, he said he used to drive his girlfriend's white Kia.

L.      *Prosecution Rebuttal*

Officer Plummer denied planting a gun in Doe's car. Both Officer Plummer and Officer Sims testified that neither of them ever threatened Doe. Officer Plummer denied making any promises to Doe or telling him what to say.

II

SPEEDY TRIAL

Defendant contends that the trial court violated his speedy trial rights by repeatedly continuing the trial to accommodate counsel for his then-codefendant.

A.      *Additional Factual and Procedural Background*

The complaint and the information jointly charged both defendant and Johnson.

The complaint was filed on June 29, 2017. On November 3, 2017, the information was filed and defendant was arraigned.

Trial was initially set for December 18, 2017. After five continuances, which defense counsel either requested or did not object to, the case was set for trial on March 2, 2018.

On that date, counsel for Johnson requested a continuance because he was in trial in a death penalty case that was estimated to last through June. Counsel for defendant objected. The trial court found there was good cause for a continuance — namely, to "continue the joinder." It continued the trial to May 18.

On that date, Johnson's counsel requested another continuance because he was still in trial. Counsel for defendant objected. The trial court nevertheless found good cause and continued the trial to June 22.

On that date, Johnson's counsel was not present. Defendant's counsel made a special appearance for him, noted he was still in trial, and requested a continuance on his behalf. The trial court found good cause and continued the trial to July 27.

On that date, the trial began. On August 13, as he was delivering his opening statement, Johnson's counsel had a heart attack. He died later that day. The trial court declared a mistrial as to Johnson. Thus, defendant was tried alone.

B.     *Forfeiture and Ineffective Assistance*

As we will discuss in part II.C.2.c, *post*, the federal constitutional right to a speedy trial is not automatically forfeited by failure to raise it in the trial court.

By contrast, the state constitutional and statutory rights to a speedy trial *can* be forfeited. "The right to a speedy trial . . . will be deemed waived unless the defendant

*both* objects to the date set *and* thereafter files a timely motion to dismiss." (*People v. Wilson* (1963) 60 Cal.2d 139, 146.)

"It is not enough that the defendant has objected at the time the cause was set for trial beyond the statutory period . . . . [Citation.] The defendant must also move to dismiss after the expiration of the allowable delay (but before the beginning of trial) so that if the court decides that the statutory period has been exceeded, that there has not been good cause for the delay, and that a proper and timely objection was made, a futile trial will be avoided." (*People v. Wilson*, *supra*, 60 Cal.2d at p. 147.)

Here, defense counsel objected, but he did not move to dismiss. Thus, he forfeited defendant's state speedy trial rights.

Defendant argues that, because the trial court overruled his objection, a motion to dismiss would have been futile. We recognize that "'[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . .' [Citations.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 92.) In *Wilson*, however, the Supreme Court specifically held that even after a defendant has objected to a continuance, and even after that objection has been overruled, the defendant still must also move to dismiss — and that failure to do so is a forfeiture.

Defendant therefore also argues, alternatively, that his trial counsel rendered constitutionally ineffective assistance by failing to move to dismiss.

"To establish ineffective assistance of counsel, [defendant] must show that [his] counsel's performance was deficient and that [he] suffered prejudice from the deficient

performance. [Citation.] On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" [Citation.]" (*People v. Caro* (2019) 7 Cal.5th 463, 488.)

In this case — assuming the objection had merit — there could be no satisfactory reason for not moving to dismiss. There could be many reasons why defense counsel might choose not to *object*; once he objected, however, there could be no reason not to move to *dismiss*. The People speculate that "counsel may have simply concluded that the extra time gained from the continuances, although against appellant's interest in a timely trial, was counterbalanced by the additional time provided to appellant to investigate various avenues of defense." This, however, would be a reason not to object in the first place. Adding a motion to dismiss, whether granted or denied, could not make defendant or his counsel any worse off.

Accordingly, the issue of ineffective assistance boils down to whether defendant's state statutory or constitutional speedy trial rights were violated. If they were, then defense counsel rendered ineffective assistance by not moving to dismiss. On the other hand, if they were not, this failure was not deficient and not prejudicial. We therefore address the merits below.

C.    *Discussion*

In California, there are three sources of the right to a speedy trial. Defendant relies on all three.

1.    *The state statutory right*

Section 1382, subdivision (a)(2), as relevant here, provides that "[i]n a felony case, when a defendant is not brought to trial within 60 days of the defendant's arraignment on an . . . information," "[t]he court, unless good cause to the contrary is shown, shall order the action to be dismissed . . . ." (§ 1382, subd. (a).) "However, an action shall not be dismissed under this paragraph if" (§ 1382, subd. (a)(2)), among other things, "[t]he defendant requests or consents to the setting of a trial date beyond the 60-day period. . . ." (§ 1382, subd. (a)(2)(B).) The defendant's consent may be express or implied. (*Ibid.*)

"No affirmative showing of prejudice is necessary to obtain a dismissal for violation of the state constitutional speedy trial right as construed and implemented by statute. [Citation.] Instead, 'an unexcused delay beyond the time fixed in section 1382 of the Penal Code without defendant's consent entitles the defendant to a dismissal.' [Citation.]" (*People v. Martinez* (2000) 22 Cal.4th 750, 766, italics omitted.)

"[W]e review a trial court's decision to grant a continuance for good cause for abuse of discretion. [Citations.]" (*Burgos v. Superior Court* (2012) 206 Cal.App.4th 817, 824.)

Section 1050.1, as relevant here, provides: "In any case in which two or more defendants are jointly charged in the same . . . information, and the court . . . , for good

16

cause shown, continues the . . . trial of one or more defendants, the continuance shall, upon motion of the prosecuting attorney, constitute good cause to continue the remaining defendants' cases so as to maintain joinder. The court . . . shall not cause jointly charged cases to be severed due to the unavailability or unpreparedness of one or more defendants unless it appears to the court . . . that it will be impossible for all defendants to be available and prepared within a reasonable period of time."[4]

"Furthermore, long before the enactment of section 1050.1 in 1990, California decisions had recognized that a trial court properly may find that the significant state interests that are furthered by conducting a single trial of jointly charged criminal defendants constitute good cause to continue a codefendant's trial beyond the presumptive statutory period designated in section 1382." (*People v. Sutton*, *supra*, 48 Cal.4th at p. 559.)

"[A] joint trial . . . '"ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials." [Citation.] "A unitary trial requires a single courtroom, judge, and court attach[és]. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both

---

[4] Despite its reference to a "motion of the prosecuting attorney," section 1050.1 "was not intended, and reasonably cannot be interpreted, to require an explicit motion by the prosecutor seeking such a continuance." (*People v. Sutton* (2010) 48 Cal.4th 533, 559.)

17

in trial and through the appellate process." [Citations.]' . . . [¶] Further, . . . a joint trial of multiple defendants charged with the same or related offenses avoids the often significant increased burden on crime victims and witnesses that would be imposed by multiple trials." (*People v. Sutton*, *supra*, 48 Cal.4th at p. 560, fn. 15.)

Defendant argues that a continuance to maintain joinder is not *necessarily* authorized under section 1050.1. He cites *Smith v. Superior Court* (2012) 54 Cal.4th 592, which stated: "[W]hen the proposed delay to permit a single joint trial is relatively brief, the substantial state interests that are served in every instance by proceeding in a single joint trial generally will support a finding of good cause to continue the codefendant's trial under section 1382"; however, "the state interests in a joint trial must be 'especially compelling' if the continuance to allow a joint trial will be lengthy . . . ." (*Id.* at p. 599, citing *People v. Sutton*, *supra*, 48 Cal.4th at p. 560.)

At this point in its opinion, however, the *Smith* court (like the *Sutton* court before it) was not discussing section 1050.1. Rather, it was discussing California decisions "'[l]ong before the enactment of section 1050.1.'" (*Smith v. Superior Court*, *supra*, 54 Cal.4th at p. 599.) Neither *Smith* nor *Sutton* held that section 1050.1 is similarly limited. By its terms, it is not. Any limitations on a continuance to maintain joinder must find their source in due process, not in section 1050.1.

Alternatively, however, even assuming a continuance under section 1050.1 must be either "relatively brief" or else justified by "especially compelling" state interests in a joint trial, the trial court here did not abuse its discretion.

18

The first continuance to which defendant objected was about two and a half months (from March 2 to May 18). The second one was about a month (from May 18 to June 22). In support of its distinction between a "relatively brief" continuance and a "lengthy" continuance, *Sutton* cited *Greenberger v. Superior Court* (1990) 219 Cal.App.3d 487. (*People v. Sutton*, *supra*, 48 Cal.4th at p. 560.) *Greenberger*, in turn, indicated that merely maintaining joinder, without more, will justify a continuance of two and a half or three months, though not a continuance of six months. (*Greenberger v. Superior Court*, at p. 501.) The continuances here, whether considered separately or together, were within this window.

Moreover, the interest in a joint trial was particularly compelling in this case. At the time, everyone expected this to be a multi-defendant gang murder case. Even though the trial ended up being solely against defendant, it required 22 witnesses, and it went from July 27 through September 17 (not including the trial on the prior conviction allegations). Under these circumstances, there was a sufficiently compelling interest in a joint trial to justify both of these continuances.

### 2. *The federal constitutional right*

"The Sixth Amendment to the federal Constitution, as applied to the states through the due process clause of the Fourteenth Amendment [citation], guarantees a criminal defendant the 'right to a speedy and public trial.'" (*People v. Harrison* (2005) 35 Cal.4th 208, 225.

"To determine whether defendant's federal right was violated, we evaluate the length of the delay, the reason for the delay, defendant's assertion of his right, and the prejudice to defendant. [Citations.]" (*People v. Harrison*, *supra*, 35 Cal.4th at p. 227; accord, *Barker v. Wingo* (1972) 407 U.S. 514, 530.)

a. *The length of the delay*

"'Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay [citation] . . . . If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. [Citation.] . . .' [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 234.)

What is presumptively prejudicial "is necessarily dependent upon the peculiar circumstances of the case. . . . [T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." (*Barker v. Wingo*, *supra*, 407 U.S. at pp. 530-531.)

For federal constitutional purposes, delay is measured from when the right attaches through trial. (LaFave, Criminal Procedure (4th ed. 2015) § 18.2(b).)[5] The right attaches "upon '"either a formal indictment or information or else the actual restraints

---

[5] The People identify the relevant delay as the four months from defendant's first objection and up to a continuance to the start of trial. That is incorrect. Defendant's time waivers are relevant to the third factor — his assertion of his speedy trial right — but not to the total length of the delay. (LaFave, Criminal Procedure (4th ed. 2015) § 18.2(b).)

20

imposed by arrest and holding to answer a criminal charge."' [Citation.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 26.) Here, defendant was arrested on July 5, 2017. He remained in custody until trial began on July 27, 2018. (Cf. *People v. Williams* (2012) 207 Cal.App.4th Supp. 1, 7.) Thus, the total delay was a little over a year. Such a delay has been generally recognized as presumptively prejudicial; however, it is at the extreme low end of the range. (*Doggett v. United States* (1992) 505 U.S. 647, 652, fn. 1; LaFave, Criminal Procedure (4th ed. 2015) § 18.2(b) & cases cited.) Moreover, because this was a moderately complex, multidefendant gang murder case, arguably a delay of a little over a year was not presumptively prejudicial at all.

b.        *The reason for the delay*

"A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Barker v. Wingo*, *supra*, 407 U.S. at p. 531, fn. omitted.)

Here, as already discussed (see part II.C.1, *ante*), the reason for the delay was valid — to promote judicial economy.

Defendant argues the delay was attributable to the state, because it "was the result of the state's failure to provide a sufficient number of appointed defense counsels." It has

21

been held, however, that for purposes of the federal constitutional speedy trial right, delay caused by the defendant's own appointed counsel is not normally attributable to the state. (*Vermont v. Brillon* (2009) 556 U.S. 81, 91-93.) There may be exceptions when the delay "resulted from the trial court's failure to appoint replacement counsel with dispatch," or when "there is 'a breakdown in the public defender system.'" (*Id*. at p. 85.) But neither was the case here. We see no reason to treat delays caused by a codefendant's appointed counsel any differently.

c.      *Defendant's assertion of his right*

For purposes of the federal constitutional speedy trial right, a failure to object to a delay is not a forfeiture. (*People v. Seaton* (2001) 26 Cal.4th 598, 633-634.) "This does not mean, however, that the defendant has no responsibility to assert his right. . . . [T]he defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." (*Barker v. Wingo*, *supra*, 407 U.S. at p. 528.)

The trial was continued a number of times, without any objection by defendant, until it was set for March 2. Defendant did object to the next two continuances; however, he did not make a motion to dismiss (or a motion to sever). As to the third and final continuance, not only did he not object, but his counsel affirmatively requested the continuance on behalf of Johnson's counsel. This wavering posture suggests that defendant was not seriously concerned about a speedy trial.

22

d. *The prejudice to defendant*

This brings us to defendant's claim of prejudice. He points out that, at a conditional examination, Doe recanted his statements to the police. At trial, however, Doe recanted his recantation and (largely) reaffirmed his statements to the police. Defendant concludes there is "at least a reasonable chance"[6] that, if the trial had begun in March 2018, Doe would have testified in accordance with his testimony at the conditional examination.

The People deride this reasoning as "speculat[ion]." Not so. At the conditional examination, Doe was uncooperative and unruly. He answered most questions with, "I don't recall." He launched into nonresponsive outbursts, complaining, "This is double jeopardy" and "These dudes is being framed." Finally, he said, "I plead the Fifth on every and all questions."

After the conditional examination, however, but before trial, Doe was arrested and charged with felony evading. He entered into an agreement that, if he testified truthfully at defendant's trial, "the felony evading charge will go away . . . ." Thus, at trial, he was cooperative and largely reaffirmed his statements to the police.

When assessing what would have happened, there is always an element of speculation. Nevertheless, it is clear that (1) as of April 2018, Doe was uncooperative and (2) at trial, he was cooperative only as a result of his subsequent felony evading arrest.

---

[6] In his reply brief, he amends this to "almost certainly."

The only reasonable conclusion is that, if the case had gone to trial in March 2018, Doe would have either denied his statements to the police or refused to testify at all.

Nevertheless, this was not "prejudice" for speedy trial purposes.

"Prejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," namely, "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker v. Wingo*, *supra*, 407 U.S. at p. 532.)

"'Prejudice' is not caused by allowing the Government properly to strengthen its case, but rather by delays intended to hamper defendant's ability to present his defense. [Citations.]" (*United States v. Tedesco* (7th Cir. 1984) 726 F.2d 1216, 1221-1222 [continuance granted to allow the prosecution to obtain a witness was not prejudicial]; accord, *United States v. Toombs* (10th Cir. 2009) 574 F.3d 1262, 1275 [the fact that the prosecution was able to locate and procure the testimony of its primary witness was not cognizable prejudice]; *Skinner v. State* (Del. 1990) 575 A.2d 1108, 1117 ["The harm to the defendant which the speedy trial right protects . . . is not that the delay may cause new witnesses to emerge for the State, but that witnesses for the defense might disappear"].)

In *United States v. Thomas* (7th Cir. 2019) 933 F.3d 685, as here, the defendant argued that, but for the delay, a prosecution witness "might not have decided to plead guilty and agree to testify against him." (*Id*. at p. 695.) The appellate court responded, "Perhaps, but we have explained that the fact that 'the government was able to strengthen

its case against [the defendant] during the delay . . . is not relevant to the prejudice analysis.' [Citation.]" (*Ibid*.)

Defendant was not deprived of the ability to use Doe's recantation. Quite the contrary, defense counsel impeached Doe with it at trial. The fact that, at trial, Doe recanted his recantation did strengthen the People's case, but it did not weaken the defense case.

e.     *Balancing*

In sum, the only factor that supported defendant's contention was the length of the delay, and that only marginally. To the extent it raised a presumption of prejudice, the presumption was entitled to little weight because defendant could not point to any way his defense was impaired.

Separately and alternatively, even assuming defendant did show prejudice, this is not the end of the analysis. "No one factor, including prejudice, is considered 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.' [Citation.] Rather, the weight accorded to each factor depends on the circumstances of the case." (*People v. Hill* (1984) 37 Cal.3d 491, 496.)

As noted, the length of the delay was at or below the threshold of the presumptively prejudicial. Defendant asserted his speedy trial right only fitfully. And the delay was for a valid reason, which was not attributable to the state.

The fact that Doe had agreed to testify against defendant, even if deemed prejudicial, was only weakly so. Defense counsel was free to argue that this agreement deprived his trial testimony of any credibility.

The prosecution already had Doe's statements to the police. These were reliable — and his testimony at the conditional examination was unreliable — as shown by the fact that he described details of the crime scene that were corroborated by witnesses and surveillance videos. He had an obvious reason to recant — namely, fear of gang retaliation. Thus, even if Doe had testified at trial in accordance with his conditional examination, the jury most likely would have believed his statements to the police, rather than his later recantation.

Most important, there was a valid reason for the delay, which was not attributable to the state. This was sufficient to outweigh the minimal prejudice that defendant claims.

3. *The state constitutional right*

Under our state Constitution, "[t]he defendant in a criminal cause has the right to a speedy public trial . . . ." (Cal. Const., art. I, § 15.)

The analysis under the federal Constitution and under the state Constitution is similar, except in two respects (*People v. Martinez*, *supra*, 22 Cal.4th at p. 754); neither helps defendant.

"The first difference concerns the point at which the speedy trial right attaches. Under the *state* Constitution, the filing of a felony complaint is sufficient to trigger the protection of the speedy trial right. [Citations.] Under the *federal* Constitution, however,

26

the filing of a felony complaint is by itself insufficient to trigger speedy trial protection. [Citation.]" (*People v. Martinez, supra*, 22 Cal.4th at pp. 754-755.) Here, it is undisputed that defendant's state and federal speedy trial rights had attached by the time the trial court granted the challenged continuances.

"The second difference is in the showing that a defendant must make to obtain a dismissal for violation of the speedy trial right." (*People v. Martinez, supra*, 22 Cal.4th at p. 755.) Under the state Constitution, no matter how long the total delay after attachment of the right and before trial, there is no presumption of prejudice. (*Id*. at pp. 765-767.) "[A] showing of specific prejudice is required to establish a violation of our state Constitution's speedy trial right." (*Id*. at p. 756.)

Here, for purposes of the federal constitutional analysis, we have already assumed that there was a presumption of prejudice. Nevertheless, after weighing the other factors — including defendant's failure to show any significant actual prejudice — we concluded that his federal constitutional right to a speedy trial was not violated. Under the state constitutional analysis, there is no presumption of prejudice. A fortiori, we also conclude that defendant's state constitutional right to a speedy trial was not violated.

III

THE ADMISSION OF THE RAP VIDEO

Defendant contends the trial court erred by admitting the rap video.

A.    *Additional Factual and Procedural Background*

Defense counsel requested a ruling on the admissibility of the video. The trial court watched it, then held an Evidence Code section 402 hearing at which the gang expert testified. Defense counsel then objected that the video was "very inflammatory and not very relevant." The trial court overruled the objection and admitted the video. Thus, the video was played for the jury and the gang expert testified about it.

The prosecutor played the video again during her closing argument. She then said: "There he is, Travon Venable. There he is. They kill them on-scene. They kill. Slid up Medical, left that nigga's . . . head gone. That's our victim's murder. There he is. There he is[,] Travon Venable. There he is. There's Travon Venable with a rifle. That's the California Garden [*sic*] Crips."

B.    *Discussion*

Under Evidence Code section 352, "[t]he trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence. [Citation.] 'The exercise of discretion is not grounds for reversal unless "'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"' [Citation.]" (*People v. Clark* (2016) 63 Cal.4th 522, 572.)

Here, on one hand, the video had substantial probative value.

The parties stipulated that California Gardens was a criminal street gang and that defendant was a member of California Gardens. For purposes of the gang enhancement, however, the prosecution still had to prove defendant committed the crime "for the benefit of, at the direction of, or in association with" a gang, and "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) And, of course, it had to prove that he was the driver.

The gang expert opined that the fact the video was posted on YouTube tended to show the shooting was committed for the benefit of the gang and with the intent to promote criminal conduct by the gang. The video "boast[ed]" about the crime and "celebrat[ed]" it, thus encouraging other members of the gang "to go out and commit these crimes because of the praise they will get from within the gang." Moreover, referencing the crime in the video enhanced the gang's reputation.

Other cases have found insufficient evidence to support a gang allegation at least in part because the perpetrator made no effort to associate the gang with the crime. (*People v. Perez* (2017) 18 Cal.App.5th 598, 609 [no evidence "that any participant shouted out a gang name or threw up a gang sign," that anyone was "wearing gang colors," or that bystanders "knew defendant was a member of a gang"]; *People v. Ramirez* (2016) 244 Cal.App.4th 800, 819 ["no gang signs were flashed, no gang names were called out, and no gang attire was worn"].) Thus, it is crucial for the prosecution to present evidence of any such effort, if it can. That is precisely why the video was probative here.

The video also tended to show defendant was the driver. His younger brother was aware of the crime and proud it had been committed by a fellow gang member or members.[7] Admittedly, the video did not prove exactly which gang members committed the shooting. Nevertheless, because Doe identified defendant as the driver, and because defendant was a member of California Gardens, the video evidence that *some* member of California Gardens committed the shooting significantly corroborated Doe.

The video also showed defendant had access to a rifle with an extended magazine, like the one used in the shooting.

It must also be remembered defendant was also charged with unlawful possession of a firearm. Photographic evidence of him holding a rifle was highly probative evidence on this count. At the end of trial, the trial court granted a motion for acquittal on this count, because the prosecution had not introduced any evidence defendant was a convicted felon. This does not take away from the fact that, when defense counsel objected to the video, the video was probative on this count.

On the other hand, the trial court could reasonably find that the video was not unduly prejudicial. It did show defendant and his fellow gang members with money, firearms, and drugs. It also expressed pride in committing crimes and specifically in killing rival gang members. In these respects, however, the video was not significantly different from many professional rap videos, which also glorify crime and violence, as

---

[7] Defense counsel forfeited any hearsay objection by failing to object on this ground. (Evid. Code, § 353, subd. (a).) In any event, it would appear to be an adoptive admission by defendant. (Evid. Code, § 1221.)

well as the drugs, firearms, and money that go along with them. It is commonly understood that, while some professional rappers are genuine gang members, others are poseurs — "studio gangsters" — and it can be hard to tell the difference.

Photos of Johnson, showing him with a gun and throwing gang signs, were admitted without objection. As noted, it was already stipulated that California Gardens was a criminal street gang; in particular, it was stipulated that the gang's primary activities included murder, attempted murder, assaults with firearms, drug sales, carjackings, robberies, and burglaries. It was also stipulated that members of California Gardens had been convicted of five predicate offenses. The gang expert testified members of the gang had committed murder and attempted murder. He added that they are expected to commit crimes on behalf of the gang, including murder and assault. Against the background of this other evidence, the jury would hardly have been shocked that members of California Gardens, including defendant, behaved as they did in the video.

Defendant also complains about the prosecutor's references to the video in closing argument. We may assume, without deciding, that she urged the jury to consider the video for prejudicial purposes rather than for permissible purposes. Even if so, when the trial court admitted the video into evidence for those permissible purposes, it acted properly. Defense counsel forfeited any claim of prosecutorial misconduct by failing to object and request an admonition. (*People v. Hoyt* (2020) 8 Cal.5th 892, 942.)

31

In sum, then, we cannot say that the trial court abused its discretion by admitting the video.

In a subsidiary argument, defendant also contends the admission of the video violated due process. "'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "'[A]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights.' [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.) Precisely because the video was more probative than prejudicial, its admission did not render the trial fundamentally unfair. (See *People v. Thomas* (2012) 53 Cal.4th 771, 807.)

IV

INSTRUCTION TO CONSIDER A WITNESS'S

CERTAINTY ABOUT AN IDENTIFICATION

Defendant contends that the trial court erred by giving CALCRIM No. 315, because it required the jury to consider a witness's level of certainty in evaluating an identification by that witness.

A.     *Additional Factual and Procedural Background*

CALCRIM No. 315, as given here, began: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating the identification

32

testimony, you may consider the following issues or questions . . . ." One of these questions was: "How certain was the witness when the witness did make an identification?" Defense counsel did not object to this instruction.

B.    *Discussion*

Defendant argues that the quoted portion of the instruction is erroneous "in light of the numerous scientific studies showing 'at best, a weak correlation between witness certainty and accuracy' [citation] . . . ."

Preliminarily, the People respond that defense counsel forfeited this contention by failing to request a modification of the instruction. However, defendant also contends, alternatively, that his counsel's failure to request a modification constituted ineffective assistance. Rather than decide the forfeiture issue, we reach the merits, because they are dispositive of both alternative contentions.

In *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), our Supreme Court held that the instruction did not violate due process under the circumstances of that case. It noted: "[W]e have repeatedly endorsed the use of instructions that direct the jury to consider an eyewitness's level of certainty when evaluating identification evidence." (*Id*. at p. 655.)

First, it rejected the argument the instruction lowered the prosecution's burden of proof. "[T]he instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15

33

different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke*, *supra*, 11 Cal.5th at p. 657.)

Second, it rejected the argument the instruction denied the defendant "'a "meaningful opportunity to present a complete defense"'" as to why the identification was flawed . . . ." (*Lemcke*, *supra*, 11 Cal.5th at p. 660.) It noted he called an expert who testified "about the weak correlation between certainty and accuracy . . . ." (*Ibid*.) He also had a chance to cross-examine the witness who identified him and the investigating officers. (*Ibid*.)

The court did "acknowledg[e] that this form of instruction has the potential to mislead jurors." (*Lemcke*, *supra*, 11 Cal.5th at p. 665.) It therefore recommended that the Judicial Council and its Advisory Committee on Criminal Jury Instructions reevaluate CALCRIM No. 315. (*Lemcke*, at pp. 668-669.) It also directed trial courts to omit the certainty factor from CALCRIM No. 315 pending the reevaluation. (*Lemcke*, at p. 669.)

The instruction likewise did not violate due process under the circumstances here. For the reasons stated in *Lemcke*, it did not lower the prosecution's burden of proof. It also did not deprive defendant of a meaningful opportunity to present a complete defense, because he could and did cross-examine both Doe and the investigating officers. The only time Doe said he was certain of his identification was at the June 3, 2015 interview;

34

however, he recanted it in his statement to the defense investigator and his testimony at the conditional examination. At trial, he recanted his recantation, but he expressed no particular certainty. He admitted that, in his statements to the police, he "might have been[] kind of[] confused," he continued to imply that Officer Plummer coerced his testimony by planting a gun in his car, and he admitted that he was testifying pursuant to a plea bargain. Defense counsel impeached Doe to the maximum possible extent with all of his flip-flops. Admittedly, defendant did not call an expert on eyewitness identification; however, he had the opportunity to do so. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 476 ["there was nothing to stop E.H. from presenting expert evidence on eyewitness identification"].) There was no due process violation.

V

THE JURY'S FAILURE TO FIND THAT THE ATTEMPTED MURDER

WAS WILLFUL, DELIBERATE, AND PREMEDITATED

Defendant contends the jury found him guilty of simple attempted murder, not willful, deliberate, and premeditated attempted murder; thus, the trial court erred by sentencing him for the latter. The People concede the point. We agree.

Count 2 charged defendant with willful, deliberate, and premeditated attempted murder. However, the jury was never given the necessary verdict form for a finding that the attempted murder was willful, deliberate, and premeditated. It could not and therefore it did not make any such finding.

Using the verdict form it was given, the jury did find defendant guilty of attempted murder "as charged in Count 2." The People, however, do not argue that this was equivalent to a finding that the attempted murder was willful, deliberate, and premeditated. Under the circumstances, it was not. The jury was given this form, and only this form, to find defendant guilty, regardless of whether it found premeditation. Even if it found no premeditation, it had to use this wording.

The jury's finding that the murder charged in count 1 was of the first degree does not necessarily mean it would also have found that the attempted murder charged in count 2 was willful, deliberate, and premeditated. The People prosecuted defendant for first degree murder on two alternative theories — (1) premeditation and deliberation, and (2) murder by means of discharging a firearm from a motor vehicle. (See § 189, subd. (a).) We cannot tell on which theory the jury relied.

Nevertheless, on count 2, the trial court sentenced defendant to 14 years to life — the prescribed sentence for willful, deliberate, and premeditated attempted murder (§ 664, subd. (a)) with one strike. (§§ 667, subd. (e)(1), 1170.12, subd. (d)(1), 3046, subd. (a)(1).) We will direct the trial court to correct this error on remand.

## VI

## DUAL SENTENCING ON BOTH

## THE FIREARM ENHANCEMENTS AND THE GANG ENHANCEMENTS

Defendant contends the trial court erred by sentencing him on both the firearm enhancements and the gang enhancements. Again, the People concede the point. And again, we agree.

On the firearm enhancement to each count, the trial court sentenced defendant to 25 years to life. On the gang enhancement to each count, it sentenced him to 10 years (although it stayed the enhancement on count 2 pursuant to § 654).

It was undisputed defendant was not the shooter. Accordingly, he could be subject to a firearm enhancement under section 12022.53 only if a gang enhancement was also pleaded and proved. (§ 12022.53, subd. (e)(1)(A).) When an enhancement is imposed on a nonshooter under this subdivision, a gang enhancement cannot also be imposed. (§ 12022.53, subd. (e)(2).)

It follows that the trial court erred by imposing both the firearm enhancements and the gang enhancements.

## VII

## IMPOSITION OF A 10-YEAR TERM, RATHER THAN

## A 15-YEAR MINIMUM PAROLE PERIOD, ON THE GANG ENHANCEMENTS

As defendant points out in a footnote, the trial court also erred by imposing a 10-year term on the gang enhancements. Because it imposed indeterminate terms on the

underlying crimes in both count 1 and count 2, a 10-year enhancement did not apply; a 15-year minimum parole period applied instead. (§ 186.22, subds. (b)(1)(C), (b)(5); *People v. Lopez* (2005) 34 Cal.4th 1002, 1004, 1006-1011.)

With respect to count 2, however, the error is moot, because the trial court also erred by imposing an indeterminate term on that count. (See part V, *ante*.)

For a different reason, the error is also moot as to both counts. We are holding that the trial court could not impose both the firearm enhancements and the gang enhancements. (See part VI, *ante*.) On remand, the trial court *must* impose the firearm enhancements; it *cannot* impose the gang enhancements, because a firearm enhancement of any length is a greater penalty and provides for a longer term of imprisonment than a 15-year minimum parole period. (§ 12022.53, subd. (j); *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1238.)

## VIII

## THE EFFECT OF SB 1393 ON

## THE PRIOR SERIOUS FELONY CONVICTION ENHANCEMENTS

Defendant contends that, under Senate Bill No. 1393 (2017-2018 Reg. Sess.) (SB 1393), he is entitled to a remand to allow the trial court to consider striking the prior serious felony conviction enhancement. (§ 667, subd. (a).) The People concede the point. We agree.

On October 26, 2018, when defendant was sentenced, the trial court had no power to strike a prior serious felony conviction enhancement. (See former § 1385, subds. (b), (c)(2), Stats. 2014, ch. 137, § 1.) On January 1, 2019, however, while this appeal was pending, SB 1393 went into effect. (Stats. 2018, ch. 1013.) It gives a trial court discretion to strike a prior serious felony conviction enhancement. (*Ibid.*)

SB 1393 applies to all judgments that were not yet final when it went into effect. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971-973; see generally *People v. Brown* (2012) 54 Cal.4th 314, 323.)

The People do not argue it would be an abuse of discretion to strike the prior serious felony conviction enhancement. Accordingly, we will direct the trial court to consider striking the prior serious felony conviction enhancement on remand. We express no opinion on how it should exercise that discretion.

IX

SB 620

Defendant contends he is entitled to a remand so the trial court can consider whether to reduce the firearm enhancements under Senate Bill No. 620 (2017-2018 Reg. Sess.) (SB 620).

SB 620 was enacted on October 11, 2017; it became effective on January 1, 2018. (Stats. 2017, ch. 682.) It amended sections 12022.5 and 12022.53 so as to give a trial court discretion to strike a firearm enhancement under those sections. (§§ 12022.5, subd. (c), 12022.53, subd. (h).) Defendant was sentenced on October 26, 2018. In 2022, the

Supreme Court held that SB 620 also gives the trial court discretion to reduce a firearm enhancement to a lesser included firearm enhancement, even when the lesser enhancement was not charged. (*People v. Tirado* (2022) 12 Cal.5th 688, 697-702 (*Tirado*).)

Because the law on this point was not clear until *Tirado* was decided, defense counsel did not forfeit defendant's present argument by failing to ask the trial court to reduce the firearm enhancements. (See *People v. Perez* (2020) 9 Cal.5th 1, 7-8.) Moreover, again because the law was not clear, we cannot indulge the usual presumption that the trial court was aware of its sentencing discretion. (See *People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) To the contrary, we conclude it was unaware of its discretion to reduce the firearm enhancements. (See *People v. Morrison* (2019) 34 Cal.App.5th 217, 224.) Again (see part VIII, *ante*), the People do not argue it would be an abuse of discretion to reduce the firearm enhancements. Thus, we must remand to give the trial court an opportunity to exercise this discretion.

X

AMENDMENTS TO SECTION 1109

Defendant contends that, under section 1109, enacted while this appeal was pending, he is entitled to a complete retrial so the gang allegations can be tried separately.

Subdivision (a) of section 1109, effective January 1, 2022, provides that, on a defendant's request, any gang enhancements must be bifurcated and tried after a guilt phase.

40

There is a split of authority on whether section 1109 is retroactive. (Cf. *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-568 [Sixth Dist.] [retroactive], review granted July 13, 2022 (S274743); *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128-1131 [Fifth Dist.] [retroactive]; with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64-65 [Sixth Dist.] [not retroactive], petn. for rev. filed July 5, 2022; *People v. Perez* (2022) 78 Cal.App.5th 192, 206-207 [Second Dist., Div. Three] [not retroactive], petn. for rev. filed June 23, 2022; see also *Ramirez*, at pp. 67-70 [conc. opn. of Wilson, J.] [retroactive]; *Burgos*, at pp. 569-575 [dis. opn. of Elia, J.] [not retroactive].)

We need not take sides on this split in authority because we conclude allowing the evidence relevant only to the gang enhancement at the murder trial was harmless.

The main evidence of Venable's guilt came from an informant eyewitness who identified Venable as the driver of the vehicle in the shooting. In a second interview, the informant backed off parts of his story, and in an interview with a defense investigator he recanted entirely and told the investigator he didn't want a target painted on his back. However, at trial the informant identified Venable as the driver. Defense counsel impeached him with his inconsistent statements, the informant said he had lied to the defense investigator, and it fell to the jury to decide whether his testimony was credible.

Meanwhile the parties avoided a great deal of gang evidence by entering a stipulation. The parties stipulated that California Gardens and the Projects are both "criminal street gangs" and that the primary activities of California Gardens included murder, attempted murder, possession of controlled substances for sale, assaults with

41

firearms, unlawful possession of firearms, carjackings, robberies, and burglaries. They also stipulated members of California Gardens had been convicted of five predicate offenses. Finally, they stipulated defendant and Johnson were members of California Gardens. Given the strength of evidence of Venable's involvement in the crime and the limited role evidence of gang involvement played in the trial, we conclude it's not reasonably likely he would have obtained a more favorable result if the judge had bifurcated the proceedings and limited the gang evidence to a second trial.

It's true the prosecution also showed a YouTube video featuring Venable's brother rapping about the shooting. Venable appeared in the video with a firearm like the one used in the killing. The prosecution's gang expert testified the video indicated the murder had been carried out for the benefit of the gang. However, the video also tended to show Venable was the driver of the vehicle and to corroborate the testimony of the informant. As a result, the video evidence would have been admissible at the guilt phase of trial even if the guilt and gang enhancement phases had been bifurcated.

XI

AMENDMENTS TO SECTION 186.22

Defendant contends the gang enhancements (§ 186.22, subd. (b)) and the gang-related firearm enhancements (§ 12022.53, subd. (e)) must be reversed because the jury was not instructed in accordance with the most recent version of section 186.22. The People concede the point.

42

Section 186.22 was amended, effective January 1, 2022. Among other things, the amendments: (1) require that a gang be "organized" (§ 186.22, subd. (f)); (2) require that the members of the gang must "collectively" engage in a pattern of criminal gang activity (*ibid.*); (3) define "benefit, promote, further, or assist" — as used both in the definition of the enhancement and in the definition of a pattern of criminal gang activity — as "to provide a common benefit to members of a gang where the common benefit is more than reputational" (§ 186.22, subd. (e)(1)); and (4) prohibit the use of the currently charged crime to prove the pattern of criminal gang activity (§ 186.22, subd. (e)(2)). (Stats. 2021, ch. 699, § 3, pp. 8863-8866.)

The gang-related firearm enhancement requires, as one of its elements, that the defendant violated section 186.22, subdivision (b). (§ 12022.53, subd. (e)(1)(A).)

The amendments to section 186.22 apply retroactively to all cases in which the judgment is not yet final. (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 478.)

As mentioned, defendant stipulated that California Gardens was a criminal street gang and that members of California Gardens had been convicted of five predicate offenses. The People do not argue, however, that defendant is bound by that stipulation, despite the subsequent change in the law. A court may set aside a stipulation "where the facts stipulated have changed, there is fraud, mistake of fact, or other special circumstance rendering it unjust to enforce the stipulation." (*Gonzales v. Pacific Greyhound Lines* (1950) 34 Cal.2d 749, 755.) Arguably, it might be different if the

43

People were objecting that they are being deprived of some bargained-for benefit, but they are not.

Finally, the People specifically concede that the failure to instruct the jury on the subsequently enacted amendments to section 186.22 was not harmless.

It follows that we must reverse the gang enhancements and gang-related firearm enhancements. (The non-gang-related firearm enhancements under section 12022.53, subdivision (d) will stand.) On remand, the People will have the opportunity to retry these enhancements.

XII

DISPOSITION

The true findings on the gang enhancements (§ 186.22, subd. (b)) and the gang-related firearm enhancements (§ 12022.53, subd. (e)) are reversed. (See part XI, *ante*.) The People may retry these enhancements. However, if the People elect, in a writing filed in the trial court, not to retry them, or if they fail to bring defendant to a new trial on them within the applicable time limit (see Pen. Code, § 1382, subd. (a)(2)), the trial court must strike the gang enhancements and the gang-related firearm enhancements. In all other respects, the judgment with respect to the conviction is affirmed.

The judgment with respect to the sentence is reversed. On remand, the trial court must resentence defendant. In doing so, it must (1) correct the errors identified in parts V and VI, *ante*; (2) consider striking the prior serious felony conviction enhancement, as

44

discussed in part VIII, *ante*; and (3) consider reducing the firearm enhancements, as discussed in part IX, *ante*.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH_____
J.

I concur:

MENETREZ_____
J.

45

[*The People v. Travon Rashad Venable, Sr.*, E071681]

Ramirez, P. J., Concurring and Dissenting.

I concur in the judgment.  I also concur in the opinion and reasoning of the court, except with respect to part X.  In that part, the majority holds that the failure to bifurcate the gang allegations, if error, was harmless.  I respectfully disagree.

I

THE FAILURE TO BIFURCATE, IF ERROR, WAS NOT HARMLESS

For purposes of this section only, I assume that Penal Code section 1109[1] applies retroactively on appeal, and therefore that we must treat the failure to bifurcate the gang allegations as error (even though it was not error at the time).

The applicable harmless error standard is whether "it is 'reasonably probable' [defendant] would have obtained a more favorable result if his trial had been bifurcated. [Citation.]"  (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)  " " " " '[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " " ' "  [Citation.]"  (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

Defendant contends that the error made the trial fundamentally unfair, in violation of due process.  However, "a 'mere error of state law' is not a denial of due process. [Citation.]  If the contrary were true, then 'every erroneous decision by a state court on state law would come [to the United States Supreme Court] as a federal constitutional

---

[1]     All further statutory references are to the Penal Code.

question.'  [Citations.]"  (*Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21.)  If I conclude that, under the state law standard, there is no reasonable probability that the error affected the outcome, then I can hardly say that, under the federal standard, the trial was fundamentally unfair.

As courts have repeatedly recognized, gang evidence is "inherently prejudicial." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480; see also *People v. Huynh* (2021) 65 Cal.App.5th 969, 980 ["Our courts have long recognized the potentially prejudicial effect of gang membership."]; *People v. Memory* (2010) 182 Cal.App.4th 835, 862 ["'Legions of cases and other legal authorities have recognized the prejudicial effect of gang evidence upon jurors.'"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["California courts have long recognized the potential prejudicial effect of gang evidence."].)

Of course, gang evidence is often relevant to the charged offense(s) and therefore more probative than prejudicial, even in a guilt phase.  Here, for example, some gang evidence was highly relevant to show that defendant had a motive to shoot the two victims, since, as far as the evidence showed, he knew of them but did not interact with them; thus, it was also highly relevant to corroborate Doe's testimony identifying him as the shooter.

However, not all of the gang evidence was relevant for this purpose.  The relevant gang evidence was that (1) defendant and Johnson were members of California Gardens; (2) the victims were members or associates of the Projects; (3) California Gardens and

2

the Projects were rival gangs; (4) the shooting took place in the Projects' territory; and (5) Johnson needed to do something to get back into good standing with California Gardens. As the majority concludes in part III.B, the relevant evidence included the rap video.

Evidence that California Gardens met the legal definition of a "criminal street gang" (See § 186.22, subd. (f); see also *id.*, subd. (e)) was relevant solely to the gang enhancements and not to guilt. This included evidence that the primary activities of California Gardens included murder, attempted murder, possession of controlled substances for sale, assaults with firearms, unlawful possession of firearms, carjackings, robberies, and burglaries. It also included evidence that a member or members of California Gardens had been convicted of five predicate offenses, including murder, attempted murder, robbery, and unlawful possession of a firearm.

This latter evidence was significantly prejudicial. It painted the charged shooting as not just an isolated incident, but rather as one episode in a sustained gang reign of terror menacing the good citizens of San Bernardino County. In closing, the prosecutor argued, "[C]riminal street gang activity is a form of terrorism." She likened the shooting to "the Las Vegas shooting" and "[t]he Pulse Night Club shooting." She said, "The Gardens benefited because . . . witnesses now are afraid of coming forward. [¶] [That] allows the Gardens to continue . . . to commit robberies [and] burglaries . . . ." "They are doing things like stealing people's identity. They are robbing people. They are selling drugs."

3

The question of guilt was close.  Doe was the only person who could identify defendant, and he flip-flopped like a fish on the floor.  He came forward at first only because he was facing unrelated charges.  He claimed that he was at the intersection and he saw the shooting, he saw Drake run, and he saw Edwards fall.  When surveillance videos proved that this was a lie, he claimed he was a block north and he merely saw Johnson and defendant driving away after the shooting, albeit with a long gun.

He claimed that he saw a .22 rifle; later, he said someone just told him it was a .22.  He claimed that Johnson bragged about the shooting on Facebook; the police found no such Facebook post.  He claimed that Johnson told him he was putting in work for California Gardens; later, he denied this.  Finally, he recanted all of his statements to the police.  He claimed that he had been coerced and that defendant and Johnson had been framed.  He recanted his recantation only after (and inferably because) he was once again facing new unrelated charges.

Admittedly, the rap video showed defendant and other California Gardens members in possession of what appeared to be guns, money, and drugs.  The rap song included the line, "Got word from a bird[] that they did that n---a dead wrong/Slid up Medical and left that n---a head gone."  Defendant, however, took the stand and explained that the guns were fake — it was all for show.  The quoted line did not say that defendant (or any other California Gardens member) actually committed the shooting on Medical, only that they had heard about it.  As the majority says, "the video did not prove exactly which gang members committed the shooting" (maj. opn. at p. 30), and the jury

4

could have accepted that defendant and the other participants were merely "poseurs" (maj. opn. at p. 31).

Because much of the gang evidence would have been inadmissible in the guilt phase of a bifurcated trial, because that inadmissible gang evidence was significantly prejudicial, and because the evidence of guilt was skinny, there is at least a reasonable possibility that, if the trial had been bifurcated, defendant would have been acquitted.

The majority concludes that the asserted error was harmless in part because the parties stipulated to the facts that, if the trial had been bifurcated, would not have come in during the guilt phase. (Maj. opn. at pp. 41-42.) But if section 1109 had been in effect, defense counsel would never have entered into any such stipulation.

I repeat, the question is whether it is reasonably probable that defendant would have obtained a more favorable result if his trial had been bifurcated pursuant to section 1109 — i.e., if section 1109 had been in effect. Before section 1109, defense counsel prudently entered into a stipulation that minimized the prejudicial effect of the "criminal street gang" evidence. Nevertheless, defendant was convicted. After section 1109, defense counsel would have no reason to enter into such a stipulation in the guilt phase. In fact, if he did, that would fall below an objective standard of reasonable representation. And, as I have already discussed, in a bifurcated trial, without any such stipulation, it is reasonably probable that defendant would have been acquitted.

5

II

THE FAILURE TO BIFURCATE WAS NOT ERROR

I turn, then, to whether section 1109 is retroactive. As the majority notes, there is a 50-50 split of authority on this point. (Maj. opn. at p. 41.) I conclude that section 1109 is not retroactive, for the reasons stated in *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64-65 (*Ramirez*), pet. for rev. filed Jul. 5, 2022, *People v. Perez* (2022) 78 Cal.App.5th 192, 206-207 (*Perez*), pet. for rev. filed Jun. 23, 2022, and the dissent in *People v. Burgos* (2022) 77 Cal.App.5th 550, 569-575 [dis. opn. of Elia, J.], review granted Jul. 13, 2022, S274743.)

I need not explain my reasoning in full. Those cases speak for themselves. Also, it is very likely that our Supreme Court will decide the issue as soon as reasonably feasible; my opinion is just chalk on a blackboard, which its eventual opinion will erase. In brief summary, however, section 1109 is not retroactive because it does not ameliorate punishment.

"(i) [I]n the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 675.)

"Notably, section 1109 'does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or defense.' [Citation.] Rather, '[s]ection 1109 . . . is a prophylactic rule of criminal procedure expressly intended to employ new procedures aimed at enhancing the fairness of future criminal

6

proceedings.  It makes no change to any crime or defense and makes no change to any punishment provision, and it does not create the possibility of lesser punishment or any other "ameliorative" benefit from which it could be inferred that failing to extend that benefit retroactively must have been motivated by a "desire for vengeance."' [Citations.]"  (*Ramirez*, *supra*, 79 Cal.App.5th at p. 65.)  Thus, defendant is not entitled to the benefit of section 1109.

RAMIREZ_____<br>P. J.

7